United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KEVIN M. PENN,

    Petitioner,

    v.

ROBERT AYERS, JR., warden,

    Respondent.
                                    /

No. C 07-2230 SI (pr)

**ORDER DENYING HABEAS PETITION**

## INTRODUCTION

Kevin Penn, an inmate at San Quentin State Prison, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254. This matter is now before the court for consideration of the merits of the petition. For the reasons discussed below, the petition will be denied.

## BACKGROUND

Kevin Penn was convicted in San Bernardino County Superior Court of attempted first degree murder in 1992 and was sentenced to an indeterminate term of life in prison plus five years for a sentence enhancement for use of a firearm in the offense. His habeas petition does not challenge his conviction but instead challenges a June 1, 2006 decision of the Board of Parole Hearings ("BPH") that found him not suitable for parole. The 2006 hearing was Penn's third subsequent parole hearing, and was conducted at a time when he was about 14 years into his life sentence and about 4½ years past his minimum eligible parole date of October 30, 2001.

The BPH identified the circumstances of the commitment offense, Penn's extensive criminal history before the attempted murder, and the recency of his positive institutional behavior as the reasons for the determination that Penn was not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. Resp. Exh. 3 (reporter's transcript of June 1, 2006 BPH hearing (hereinafter "RT")) at 58-62. The specifics regarding the crime and the circumstances supporting the finding of unsuitability are described in the Discussion section later in this order.

Penn sought relief in the California courts. He filed a habeas petition in the San Bernardino County Superior Court that was denied in a reasoned decision. Resp. Exhs. 5-6. The California Court of Appeal summarily denied Penn's habeas petition. Resp. Exh. 8. The California Supreme Court summarily denied his petition for review. Resp. Exh. 10.

Penn then filed his federal petition for a writ of habeas corpus. The court found cognizable a claim that there was not sufficient evidence to support the decision and ordered respondent to show cause why the writ should not issue. Respondent filed an answer and Penn filed a traverse. The matter is now ready for a decision on the merits.

**JURISDICTION AND VENUE**

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged action concerns the execution of the sentence of a petitioner housed at a prison in San Quentin in Marin County, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

**EXHAUSTION**

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). The parties do not dispute that

1 state court remedies were exhausted for the claim asserted in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362, 409-13 (2000). Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole. See Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

## DISCUSSION

A.  Due Process Requires That Some Evidence Support a Parole Denial

A California prisoner with a sentence of a term of years to life with the possibility of parole has a protected liberty interest in release on parole and therefore a right to due process in the parole suitability proceedings. See Hayward v. Marshall, 512 F.3d 536, 542 (9th Cir. 2008); Sass, 461 F.3d at 1127-28; Cal. Penal Code § 3041(b); see also Board of Pardons v. Allen, 482 U.S. 369 (1987); Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442 U.S. 1 (1979).

A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision. Sass, 461 F.3d at 1128-29 (adopting some evidence standard for disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)). "To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence.

1  Instead, the relevant question is whether there is any evidence in the record that could support
2  the conclusion reached'" by the BPH. Sass, 461 F.3d at 1128 (quoting Superintendent v. Hill,
3  472 U.S. at 455-56). The "some evidence standard is minimal, and assures that 'the record is not
4  so devoid of evidence that the findings of the . . . board were without support or otherwise
5  arbitrary.'" Id. at 1129 (quoting Superintendent v. Hill, 472 U.S. at 457).[1] The some evidence
6  standard of Superintendent v. Hill is clearly established law in the parole context for purposes
7  of § 2254(d). Sass, 461 F.3d at 1129.

8  What little guidance has come from the Supreme Court suggests that judicial review
9  should be extremely deferential to the original decision-maker in the parole context. In addition
10 to the very low evidentiary standard that Superintendent v. Hill imposes, other Supreme Court
11 comments suggest that the judiciary should be quite mindful of the subjective and predictive
12 nature of a parole board's decision. See Greenholtz, 442 U.S. at 13. "No ideal, error-free way
13 to make parole-release decisions has been developed; the whole question has been and will
14 continue to be the subject of experimentation involving analysis of psychological factors
15 combined with fact evaluation guided by the practical experience of decisionmakers in
16 predicting future behavior. Our system of federalism encourages this state experimentation."
17 Id.; see also id. at 8.

18 Having determined that there is a due process right, and that some evidence is the
19 evidentiary standard for judicial review, the next step is to look to state law because that sets the
20 criteria to which the some evidence standard applies. See Hayward, 512 F.3d at 542. One must
21 look to state law to answer the question, "'some evidence' of what?"

---

[1] Although Sass saw the requirement that the decision not be "otherwise arbitrary" as part of the "some evidence" standard, 461 F.3d at 1129, Hayward saw the "some evidence" requirement as separate from the requirement that the decision not be "otherwise arbitrary." Hayward quoted Irons, infra, for the proposition: "We have held that 'the Supreme Court ha[s] clearly established that a parole board's decision deprives a prisoner of due process with respect to this interest if the board's decision is not supported by "some evidence in the record," or is "otherwise arbitrary."'" Hayward, 512 F.3d at 542.

B.      State Law Standards For Parole For Those Who Attempt Murder In California

California uses indeterminate sentences for most non-capital murders and attempted murders. For attempted first degree murders, the term is life imprisonment with the possibility of parole. Cal. Penal Code §§ 190, 664. The upshot of California's parole scheme described below is that a release date normally must be set unless various factors exist, but the "unless" qualifier is substantial.

A BPH panel meets with an inmate one year before the prisoner's minimum eligible release date "and shall normally set a parole release date. . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates." Cal. Penal Code § 3041(a). Significantly, that statute also provides that the panel "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal. Penal Code § 3041(b).

One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides: "A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public."[2] The regulation also

---

[2] The listed circumstances tending to show <u>unsuitability</u> for parole are: the nature of the commitment offense (i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner"), the prisoner has a previous record of violence, the prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual offense, the prisoner has a lengthy history of severe mental problems related to the offense, and negative institutional behavior. 15 Cal. Code Regs. § 2402(c). The listed circumstances tending to show <u>suitability</u> for parole are: the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior. 15

1  provides that "[t]he panel shall first determine whether the life prisoner is suitable for release on
2  parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and
3  denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of
4  danger to society if released from prison." 15 Cal. Code Regs. § 2402(a). The panel may
5  consider all relevant and reliable information available to it. 15 Cal. Code Regs. § 2402(b).

6  The federal habeas court's task is not to determine whether some evidence supports the
7  reasons cited for the denial of parole, "but whether some evidence indicates a parolee's release
8  unreasonably endangers public safety. Some evidence of the existence of a particular factor does
9  not necessarily equate to some evidence the parolee's release unreasonably endangers the public
10 safety." Hayward, 512 F.3d at 543 (citation omitted).

11 A critical issue in parole denial cases concerns the parole authority's use of evidence
12 about the offense that led to the conviction. Four Ninth Circuit cases provide guidance for
13 applying the Superintendent v. Hill some evidence standard on this point: Biggs v. Terhune, 334
14 F.3d 910 (9th Cir. 2003), Sass, 461 F.3d 1123, Irons v. Carey, 505 F.3d 846 (2007), and, most
15 recently, Hayward, 512 F.3d 536. Biggs explained that the value of the criminal offense fades
16 over time as a predictor of parole suitability: "The Parole Board's decision is one of 'equity'
17 and requires a careful balancing and assessment of the factors considered. . . . A continued reliance
18 in the future on an unchanging factor, the circumstance of the offense and conduct prior to
19 imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could
20 result in a due process violation." Biggs, 334 F.3d at 916-17. Biggs upheld the initial denial of
21 a parole release date based solely on the nature of the crime and the prisoner's conduct before
22 incarceration, but cautioned that "[o]ver time . . ., should Biggs continue to demonstrate
23 exemplary behavior and evidence of rehabilitation, denying him a parole date simply because
24 of the nature of Biggs' offense and prior conduct would raise serious questions involving his
25 liberty interest in parole." Id. at 916. Next came Sass, which criticized the Biggs statements as
26 improper speculation and beyond the scope of the dispute before the court. Sass, 461 F.3d at

---

Cal. Code Regs. § 2402(d).

6

1129. <u>Sass</u> determined that the parole board is not precluded from relying on unchanging factors such as the circumstances of the commitment offense or the petitioner's pre-offense behavior in determining parole suitability. <u>See id.</u> (commitment offenses in combination with prior offenses provided some evidence to support denial of parole at subsequent parole consideration hearing). The next decision, <u>Irons</u>, aligned with <u>Biggs</u>, determining that due process was not violated by the use of the commitment offense and pre-offense criminality to deny parole for a prisoner 16 years into his 17-to-life sentence, but emphasized that in all three cases (<u>Irons</u>, <u>Sass</u> and <u>Biggs</u>) in which the court had "held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence." <u>Irons</u>, 505 F.3d at 853. Most recently, <u>Hayward</u> granted relief to a prisoner who had been in custody 27 years on his 15-to-life sentence. <u>Hayward</u> repeated the quoted passage from <u>Biggs</u> and stated <u>Irons</u> had noted that "'in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes.' <u>Irons</u>, 505 F.3d at 854. 'The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison.' [In re] Scott, 133 Cal.App.4th [573, 595 (Cal. Ct. App. 2005)]." <u>Hayward</u>, 512 F.3d at 545.[3]

The message of these cases is that the BPH can look at immutable events, such as the nature of the conviction offense and pre-conviction criminality, to predict that the prisoner is not

---

[3]The California Supreme Court has determined that the facts of the crime can alone support a sentence longer than the statutory minimum even if everything else about the prisoner is laudable. "While the Board must point to factors beyond the minimum elements of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release." <u>In re Dannenberg</u>, 34 Cal. 4th 1061, 1071 (Cal.), <u>cert. denied</u>, 546 U.S. 844 (2005); <u>see also</u> <u>In re Rosenkrantz</u>, 29 Cal. 4th 616, 682-83 (Cal. 2002), <u>cert. denied</u>, 538 U.S. 980 (2003) ("[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole" but might violate due process "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense"). <u>Hayward</u> does not explain how <u>Dannenberg</u>'s more-than-the-minimum-elements rule fits into the picture, and simply ignores it.

7

currently suitable for parole even after the initial denial (Sass), but the weight to be attributed to those immutable events should decrease over time as a predictor of future dangerousness as the years pass and the prisoner demonstrates favorable behavior (Biggs, Irons, and Hayward). Also, the focus must be on whether the commitment offense demonstrates present dangerousness if it is relied upon to deny parole (Hayward). Superintendent v. Hill's standard might be quite low, but it does require that the decision not be arbitrary, and reliance on only the facts of the crime might eventually make for an arbitrary decision.

C.    Some Evidence Supports The BPH's Decision

The BPH identified the circumstances of Penn's commitment offense, escalating criminality and gang membership before incarceration, and the recency of his favorable institutional history as the reasons for the determination that he was not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison.

The crime was summarized in the probation officer's report and was described by Penn at the hearing: See Resp. Exh. 2; RT 10-14. Shortly after midnight on November 23, 1991, Ontario police department officers responded to a 7-Eleven convenience store after hearing three shots fired.

> Upon arrival, twenty-four year old victim Albert Ortega was lying [in] the parking lot and had been shot at least two times. Witnesses, who had proceeded to the convenience store with the victim were interviewed. [¶] They reported when they arrived at the store, words were exchanged between them and two Black males sitting in a yellow Cadillac, later identified as defendants Kevin Penn and Richard Reese. The defendants left the scene in their vehicle but returned a short while later and re-entered the parking lot of the convenience store. Witnesses further reported when the victim approached the defendant's vehicle, defendant Penn, who was sitting in the driver's seat, shouted out gang-related slogans, then stated, "Homeboy, pass me the gun," to co-defendant Reese. Then, defendant Penn shot victim Ortega. [¶] The victim sustained multiple gunshot wounds to the abdomen and to his right leg.

Resp. Exh. 2, attachment at 1. Although not mentioned in the probation officer's report, it later was learned that the victim had been shot three times rather than two times – the first shot was in the back, and the last two shots were those recounted in the probation officer's report. See RT 37-38, 50-51. The victim was not in a gang, although he apparently made some statement Penn

8

considered to be disrespectful to Penn's gang, the Shotgun Crips. See Resp. Exh. 2, attachment at 4-6. The victim had to be hospitalized for a month after the shooting. Id. at 4. As a result of the injuries suffered in the shooting, the victim lost his job, his home, and his car; incurred overwhelming hospital bills; and faced further hospitalization for additional major surgery. Id. at 4-5. The victim was also afraid of further attacks by Penn's gang. Id. at 5-6.

The BPH next considered Penn's pre-incarceration factors. Penn had a continuing and escalating criminal history that started at about age 14 and continued through the attempted murder he committed at age 25. In 1982 (when he was about 14), Penn was put in the California Youth Authority for a second degree burglary. In 1984, shortly after his release from the CYA, he committed a robbery for which he was convicted and sentenced to 6 years in prison. In 1987, he was arrested for assault with a deadly weapon; although the criminal charge was dismissed for insufficient evidence, Penn's parole was revoked. He was arrested in 1988 for assault with a deadly weapon and in 1989 for being a felon in possession of a firearm but the charges were dismissed. His parole was revoked, however, in connection with the 1989 arrest for being a felon in possession of a firearm. In 1990, he was convicted of driving under the influence of alcohol or drugs and causing bodily injury; he was sentenced to 24 months of probation and 127 days in county jail (suspended). In 1990, he was arrested for receiving stolen property, but no disposition was listed in the record. In October 1991, he was arrested for being an ex-felon in possession of a firearm, but was released for insufficient evidence. A month later he was arrested for the attempted murder. See Resp. Exh. 4, p. 4.

Penn had been an active member in the Shotgun Crips street gang. He stated that he joined when he was about 15 or 16 years old and remained in the gang for 2-3 years after the shooting.

Penn also had an alcohol problem. He had started drinking alcohol at about age 12 and was drunk at the time he committed the attempted murder. See RT 20-21.

The BPH next reviewed Penn's history in prison. Penn had received two CDC-115 rule violation reports: one in 1998 for mutual combat and one in 1999 for manufacturing alcohol. These were both serious, as indicated by the 90-day loss of time credits for the 1998 offense and

9

a 120-day loss of time credits for the 1999 offenses.  He also had received five CDC-128s (counseling memoranda) for lesser infractions in 1993, 1994, 1996, 1997, and 1998.

Penn also had many positive accomplishments in prison.  See Resp. Exh. 4, p. 8-9.  He had obtained vocational certificates in HVAC, diesel mechanics, and powder painting.  He had received his GED in 1986 and was taking a college course at the time of the hearing.  He also had many laudatory counseling memoranda from 1997 through the time of the hearing in 2006.  And he had done therapy and self-help activities, mostly since 1999.  He had been in A.A. since 1994, but had only taken it seriously since 2000 or 2001.  See id. at 8; RT 56.  Penn characterized his 1999 CDC-115 for manufacturing alcohol as a relapse.  RT 46.

Penn's parole plans were considered by the BPH.  He planned to live with his mother and to work as a metal fabricator.  He also planned to participate in A.A. on parole.

The BPH also considered the two most recent psychological evaluations of Penn from 2005 and 2006.  The reports were not particularly favorable.  Both evaluators noted that Penn had an Axis II diagnosis of antisocial personality disorder, improving. RT 31-34 Both evaluators noted that a return to alcohol abuse would be a risk factor for further criminal activity.  The 2005 report stated that Penn rated moderately high for risk factors in comparison with inmates who committed similar crimes.  RT 34.

The BPH heard closing arguments from the local district attorney who opposed parole, from Penn's counsel and from Penn before recessing to deliberate.

The BPH decided that Penn was "not yet suitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety if released from prison." RT 58. The first reason articulated in support of that determination was that the commitment offense which was "about as cold-blooded as you get." RT 58. Penn had tried to kill the man "over just an incredibly ridiculous issue." RT 58.  The BPH also noted that the victim's 3-year old child was nearby in a car during the shooting.  The BPH also noted that this was not an isolated incident, but was reflective of Penn's gang lifestyle.  The BPH considered a circum-stance and factors proper under California law, even if the commissioner did not correctly quote the language of the regulation.  A circumstance tending to indicate unsuitability for parole is that

10

"the prisoner committed the offense in an especially heinous, atrocious or cruel manner." 15 Cal. Code Regs. § 2402(c)(1). Factors to be considered include whether the "offense was carried out in a dispassionate and calculated manner, such as an execution-style murder," and whether the "motive for the crime is inexplicable or very trivial in relation to the offense." 15 Cal. Code Regs. § 2402(c)(1)(B, E). The evidence supported a finding that the shooting was exceptionally cruel, as Penn had shot the victim in the back as the victim tried to flee when Penn obtained his gun and shot him for the exceptionally trivial reason that the victim (who was not a gangmember) had said something disrespectful about Penn's gang.

In addition to the attempted murder, the BPH identified Penn's pre-offense criminality to support the determination that Penn's release would present an unreasonable risk of danger to society. Penn's extensive and lengthy pattern of criminal activity before the attempted murder and admitted active gang membership provided plenty of support for reliance on this factor. See 15 Cal. Code Regs. § 2402(c)(2, 3).[4]

The BPH also relied on the recency of Penn's favorable institutional performance to support its decision. Basically, the BPH wanted to see a longer period of positive behavior from Penn before it would see him as parole suitable. This frequently cited reason rings hollow in many cases but not so in Penn's case. The record provides ample support for the BPH's view that Penn was now on the right path but had not been on it until about the last six years and that was not long enough for the BPH. Penn had not done much, if any, self-help and therapy programming until he had been in prison for about seven years. The record supports his view that he changed in about 2000 or 2001. See RT 39. Not only did he not do much in the way of self-improvement until about 2000, he had received two serious disciplinary reports in 1998 and 1999. Where, as here, the prisoner has committed a violent offense while intoxicated, his further violence in prison (as reflected by the CDC-115 for mutual combat in 1998) and his further abuse of alcohol (as reflected by the CDC-115 for manufacturing alcohol in 1999) indicate he

---

[4]Regardless of whether the information relied upon fit within the specific circumstances listed in § 2402(c), it could be considered because § 2402(c) was not an exclusive listing of factors and § 2402(b) provided that "[a]ll relevant, reliable information available to the panel shall be considered in determining suitability for parole."

1 had not progressed very far in his rehabilitation efforts. The BPH was justifiably concerned
2 about Penn's relapse into alcohol abuse.

3 Like many parole candidates, Penn objects to the parole authority's continued reliance on
4 his commitment offense and his pre-incarceration history.  The cluster of Ninth Circuit cases
5 discussed earlier instruct that the BPH can look at immutable events, such as the nature of the
6 conviction offense and pre-conviction criminality to predict current unsuitability, but the weight
7 to be attributed to those immutable events should decrease over time as a predictor of future
8 dangerousness as the years pass *and the prisoner demonstrates favorable behavior.* Here, Penn
9 continued to engage in misconduct in prison, so that his behavior undermines rather than
10 supports a view that he has been rehabilitated.  Cf. Hayward, 512 F.3d at 544 (absence of recent
11 disciplinary offenses or misconduct weighs in favor of finding inmate presents no probable
12 danger to society).  The serious rule violation reports issued in 1998 and 1999 (following almost
13 annual issuance of counseling memoranda for less serious offenses) reflect an unwillingness to
14 follow rules and conform to societal norms.  Although Penn had many accomplishments in
15 prison, his in-prison misconduct takes his case out of the category of cases where the BPH has
16 relied on only pre-incarceration facts that the prisoner can never change.

17 Each of the factors the BPH relied on had evidentiary support in the record.  The several
18 factors combined provided significantly more than some evidence to determine that 14 actual
19 years into a life sentence, Penn would pose an unreasonable risk of danger to society and a threat
20 to public safety if released on parole.

21 The San Bernardino County Superior Court upheld a decision in a reasoned order. Resp.
22 Exh. 7.  However, the superior court's decision was written on the assumption that Penn was
23 lodging a second challenge to the 2005 BPH denial rather than a new challenge to the 2006 BPH
24 denial.[5]  Even though the San Bernardino County Superior Court's decision is a reasoned
25 decision, it had – as Penn correctly noted – neglected to rule on his challenge to the 2006 parole

---

[5] The state superior court's mistake may have been prompted by Penn's odd choice to begin his challenge to the 2006 decision by referring to his earlier-filed petition (that had challenged the 2005 decision) and disagreeing with the court's analysis of the earlier-filed petition.  See Resp. Exh. 5, "Introduction" section of attachment.

12

denial. See Resp. Exh. 7, pp. 19-20. There is no indication that the decisions of the California Court of Appeal or the California Supreme Court repeated this mistake. This court therefore considers the California Supreme Court's summary denial as the operative decision for purposes of § 2254(d). That court's rejection of Penn's due process claim was not contrary to or an unreasonable application of Superintendent v. Hill's some evidence standard.

D.     Apprendi Argument

Penn urges that the BPH's reliance on facts not found to be true beyond a reasonable doubt and not found by a jury violates the rule set out in Apprendi and its progeny. The argument fails to persuade the court because Penn's Sixth Amendment rights were not implicated, let alone violated, by anything the BPH did in considering his case.

Penn relies on a recent line of Supreme Court cases that started with Apprendi v. New Jersey, 530 U.S. 466 (2000). The rule from that line of cases is that, "under the Sixth Amendment, any fact that exposes a defendant to a greater potential sentence [than the statutory maximum] must be found by a jury, not a judge, and established beyond a reasonable doubt, not merely by a preponderance of the evidence." Cunningham v. California, 127 S. Ct. 856, 863-64 (2007). The relevant statutory maximum "'is not the maximum sentence a judge may impose after finding additional fact, but the maximum he may impose without any additional findings." Id. at 860 (quoting Blakely v. Washington, 542 U.S. 296 303-04 (2004)).

Penn's argument runs into the insurmountable hurdle that the statutory maximum for his crime is life imprisonment. The maximum sentence allowed under California law following a guilty verdict on attempted first degree murder is life imprisonment. See Cal. Penal Code § 190, 664(a). No additional facts need to be found in order for Penn to be kept in prison for the rest of his life. Nothing the BPH did has caused Penn's sentence to extend beyond the life maximum to which he was sentenced and for which he may be imprisoned based on the attempted murder conviction. He has no right to jury trial in connection with any decision whether to release him before the expiration of his life maximum term. That the Apprendi line of cases does not apply is evidenced by the fact that an indeterminate sentencing scheme is one of the proposed solutions

13

to the jury trial problems caused by determinate sentencing schemes the Court has invalidated. See, e.g., Blakely, 542 U.S. at 305 (citing with approval Williams v. New York, 337 U.S. 241 (1986) (judge's consultation of facts outside the trial record to decide whether to sentence defendant to death did not violate the jury trial right because the indeterminate sentencing scheme allowed the judge to sentence the defendant to death or imprisonment)); see also id. at 332 (Breyer, J., dissenting) (noting that one of the alternatives to Guidelines-type sentencing scheme is indeterminate sentencing, such as California's former system). In Blakely, the Court explained that indeterminate sentencing that gives a judge greater judicial power to set the sentence does not infringe on the province of the jury: "It increases judicial discretion, to be sure, but not at the expense of the jury's traditional function of finding the facts essential to the lawful imposition of the penalty. Of course, indeterminate schemes involve judicial factfinding, in that a judge (like a parole board) may implicitly rule on those facts he deems important to the exercise of his sentencing discretion. But the facts do not pertain to whether the defendant has a legal right to a lesser sentence–and that makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned." Blakely, 542 U.S. at 308-09.

     Penn's belief that there is a statutory maximum under the matrix is simply a misunderstanding of the law: there is no statutory maximum term of years for a person convicted of attempted first degree murder. California does have a regulation with a matrix of suggested base terms for several categories of crimes, see 15 Cal. Code Regs. § 2403, but that matrix is not consulted to set a term unless and until the BPH has found the inmate suitable for parole. See 15 Cal. Code Regs. § § 2401, 2402, 2403(a); In re Dannenberg, 34 Cal. 4th 1061, 1070-71, 1078 (Cal.), cert. denied, 126 S. Ct. 92 (2005). The BPH has not yet had the occasion to consult the matrix to determine an appropriate term for Penn because it has not yet found him suitable for parole. The matrix does not set a statutory maximum for the length of imprisonment for a person convicted of attempted murder; California Penal Code § 190 and § 664 do, and those sections set the statutory maximum for such an inmate at life imprisonment. No jury trial must be provided to keep the life inmate in prison beyond highest number of years in the matrix. The Sixth Amendment right to jury trial or proof beyond a reasonable doubt has no applicability to

the parole determination for California's prisoners convicted of attempted murder who are serving indeterminate life sentences.

**CONCLUSION**

For the foregoing reasons, the petition is denied. The clerk shall close the file.

IT IS SO ORDERED.

DATED: 5/1/08

                           _____
                           SUSAN ILLSTON
                           United States District Judge